**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS
AT KANSAS CITY**

| | |
|---|---|
| **Dan Brown, On Behalf of Himself<br>And All Others Similarly Situated,**　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　　　**Plaintiff,**　　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | **Case No. :** 13-cv-2310 JAR/GLR |
| **v.**　　　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | **JURY TRIAL DEMANDED** |
| **MONSANTO COMPANY,**　　　　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| **Serve:**　　**Corporation Service Company**　) | |
| 　　　　　**2900 SW Wanamaker Drive**　) | |
| 　　　　　**Suite 204**　　　　　　) | |
| 　　　　　**Topeka, Kansas 66614**　　) | |
| 　　　　　　　　　　　　　　　　　) | |
| 　　　　　　**Defendant.**　　　　　) | |

## COMPLAINT – CLASS ACTION

Plaintiff Dan Brown ("Brown" or "Plaintiff") brings this Class Action Complaint against

Defendant Monsanto Company ("Monsanto" or "Defendant") individually, and on behalf of all

others similarly situated, and states as follows:

## I.　　INTRODUCTION

1.　　Plaintiff is a wheat farmer in Kansas, and is seeking redress from Monsanto

because, like thousands of wheat farmers in Kansas and across the United States, he has lost a

significant amount of money and his livelihood is now at serious risk after Monsanto allowed

unapproved, commercially harmful, and potentially dangerous genetically-engineered wheat to

be released into the public, whereupon it contaminated the American wheat supply.

2.　　Monsanto initiated technical development for wheat genetically-engineered to be

herbicide-tolerant, which it labeled "Roundup Ready Wheat" ("RRW"), in 1997, suspended the

research program in 2005, but restarted testing in 2011.   Monsanto was and is fully aware that

neither the United States nor its trading partners has approved RRW or any other genetically-engineered wheat for the public.  Monsanto also was and is fully aware that adulterating the wheat grown by American farmers with Monsanto's genetically-engineered strains such as RRW seriously threatened the commercial viability of not only the American farmers' crops, but the entire American wheat industry.

3.      On May 29, 2013, the United States Department of Agriculture (USDA) revealed that RRW had escaped Monsanto's control.  Earlier in April 2013, an Oregon farmer discovered "volunteer wheat," *i.e.* unplanted and undesired wheat that is essentially weeds, which survived the glyphosate herbicide he applied to his fields in preparation for spring seeding.  Mystified, the Oregon farmer sent samples of that volunteer wheat to Oregon State University ("OSU") for testing.  OSU tested the samples and identified the volunteer wheat to be RRW.  OSU notified the USDA, which commenced its investigation.  The USDA investigation continues.

4.      International and domestic markets responded immediately.  The day after the USDA made its May 29 announcement, Japan suspended wheat imports from the United States and cancelled an order.  South Korean millers followed and suspended their purchases, while importers in Taiwan demanded the United States label the wheat cargo by state of origin.  The European Union announced that it will recommend member states to test imported American wheat.  Wheat futures jumped from the possibility of lower global supplies and remain volatile pending the investigation, but American farmers face a steep decline in income as the domestic supply duly expands from the closure of international markets.

## II.      PARTIES

5.      Plaintiff Dan Brown is a Kansas wheat farmer who resides in, and owns and operates a wheat farm in Seward County, Kansas.  At all times relevant to this action, Brown,

through his farm, was a wheat producer in the State of Kansas.  Plaintiff, therefore, is a citizen of Kansas.

6.      Monsanto is a Delaware corporation with its principal office and headquarters at 800 North Lindbergh Boulevard, Saint Louis, Missouri 63167.  Monsanto, therefore, is a citizen of Missouri and Delaware.  Monsanto is authorized to do business in the State of Kansas.

7.       Monsanto was founded in 1901, and through its long history, it has created and manufactured numerous products and chemicals ranging from saccharin, an artificial sweetener, to Agent Orange, an herbicide and defoliant.  Monsanto now focuses on biotechnology, with current products including glyphosate herbicides and seeds.  Monsanto is a pioneer in genetically-modified crops, and it offers genetically-modified and government-approved maize, soybean, cotton, sugar beet, and canola plants to farmers.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1711, *et seq*.  This Court has jurisdiction over the Defendant because it is a corporation actively doing business and does sufficient business in Kansas, has sufficient minimum contacts in Kansas, or otherwise intentionally avails itself of the markets within Kansas, through manufacturing, production, promotion, sale, marketing and distribution of its products in Kansas, to render the exercise of jurisdiction by this Court proper and necessary.

9.      Venue is proper in this Court under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendant transacts a substantial amount of business in this District, or Defendant otherwise has sufficient contacts with this District to justify it being fairly brought into court in this District.

## IV.   FACTUAL BACKGROUND

### A.   Kansas Wheat Production

10.     Kansas farmers provide a significant amount of wheat to the market.  On average, Kansas produces more wheat that any other state. The 2011 figures show that 28,216,064 acres were used to produce more than 360 million bushels of wheat worth nearly $1 billion.  Around 50% of that wheat is exported, with Asian nations such as Japan, South Korea, and Taiwan supplying portions of that demand.

11.     Kansas wheat farmers, like all other American wheat farmers, do not grow genetically-modified wheat.  Not only has no genetically-modified wheat strain been approved for planting by the American government, but nations including Japan, South Korea, Taiwan, and those in the European Union have made clear that they would not import genetically-modified wheat.  Accordingly, Kansas wheat farmers do not farm genetically-modified wheat commercially because there is no domestic or foreign market for it.

### B.   Monsanto's Development of RRW

12.     RRW was genetically-modified to confer tolerance to the herbicidal compound glyphosate (N-phosphonomethyl-glycine), which is the active ingredient in the Roundup agricultural herbicide marketed by Monsanto.  To achieve this, the CP4 EPSPS protein, which has a reduced weakness to glyphosate from the *agrobacterium* species, a plant bacterium, was introduced into the subject wheat specimen.

13.     Monsanto initiated technical development of its RRW in 1997.  Field testing began in 1998 but was suspended in 2005 when Monsanto realized that the market would reject an attempt to introduce RRW for general production.  By then, Monsanto submitted its findings that RRW was safe for human consumption and feed in the consultation process with the FDA,

which agreed "based on Monsanto's data and information."  Nevertheless, Monsanto halted its application for final FDA approval, so RRW was never fully vetted and approved for general production or introduction in the United States, or, for that matter, any other country.  RRW was authorized for field-tests in 2,000 acres, and underwent trials in 16 states until testing was suspended in 2005: Kansas, Oregon, Washington, Montana, North Dakota, South Dakota, Arizona, California, Colorado, Hawaii, Idaho, Illinois, Montana, Nebraska, Oklahoma, and Wyoming.  Although Monsanto was reported as stating in late May 2013 that it had completed "closing out the Roundup Ready wheat program" nine years ago, later news articles revealed that in 2011 Monsanto resumed testing RRW with 15 trials at sites in North Dakota and Hawaii.

14.     Field testing of genetically-modified crops is stringently regulated by the USDA because the risk of contamination from potentially dangerous specimen poses a very large threat to both commerce and human safety.  Thus, rules regarding shipment, storage, isolation, separation, and monitoring need to be strictly adhered to in order to reduce the risk of contamination.

## C.     The Risks of Contamination from Field Testing and Monsanto's Awareness of Those Risks

15.     The Animal and Plant Health Inspection Service ("APHIS") is the agency of the USDA that is responsible for protecting animal health, animal welfare, and plant health.  APHIS is responsible for regulating any and all field trials of genetically modified crops according to the Plant Protection Act ("PPA") codified at 7 C.F.R. § 340, *et seq*.

16.     Monsanto knew that there was a high risk that the RRW being tested could escape the trials and contaminate commercial farmland.  Specifically, Monsanto knew that wheat is a cross-pollinating plant. Monsanto therefore knew that even if the proper FDA precautions were followed, and especially if the proper FDA precautions were NOT followed, RRW stored,

planted, and/or tested in the Kansas test sites and any other test sites in the United States could spread to commercial farmland and both commingle and cross-pollinate with marketable, non-genetically modified wheat crops.  The cross-pollinated wheat would be rendered unmarketable because its genetic makeup would be altered by the unapproved genetic modifications, while wheat crop commingled with RRW would either be discarded or subject to prior testing and sorting, subjecting farmers to increased costs and delays.  Monsanto also knew or should have known that the RRW could contaminate the non-genetically modified seed wheat in ways including but not limited to: 1) birds and/or other natural elements, such as wind, from transporting the RRW to fields that were supposed to only contain non-genetically modified wheat to be sold as seed wheat, *i.e.* volunteer wheat; 2) Monsanto's use of equipment on fields where the RRW was being planted/grown/tested, and then using the same equipment on fields that were supposed to only contain non-genetically modified seed wheat, thereby transporting RRW and contaminating the previously non- genetically modified seed wheat fields; and 3) commingling of genetically modified wheat with non-genetically modified wheat during harvest, transport, storage and processing.

17.     Despite the preceding facts, Monsanto and its agents or employees planted and tested RRW on property in Kansas and across the United States.  On those same fields, Monsanto knew or should have known that its agents or employees or other farmers would then farm non-genetically modified wheat for the purpose of growing seed wheat to sell to wheat farmers and seed companies that Monsanto knew would ultimately be planted by farmers for commercial wheat production.  Monsanto altogether failed to take proper precautions and/or to prevent the commingling of its RRW with non-genetically modified wheat and/or volunteer

RRW from germinating, maturing, developing and contaminating what was sold and represented to farmers and seed companies as non-genetically modified seed wheat.

18.     Moreover, the fact that RRW was specifically-designed to be pesticide-resistant means that attempts to exterminate discovered contamination would be considerably more costly.

19.     Indeed, Monsanto knew or should have known of such dangers because it has been cited with noncompliance with such rules at least five times since 1995, including allowing unapproved genetically-modified cotton to be harvested with an approved variety, failing to check corn technicians at a field trial that allowed the genetically-modified corn pollen to contaminate the commercial corn grown in the field the following year, and conducting field trials for genetically-modified corn without even notifying the USDA.

20.     Also, Monsanto never properly informed or disclosed to any Kansas wheat farmers, including Plaintiff, that RRW was being stored and/or grown on Kansas soil or anywhere else in the United States.  Monsanto failed to inform Plaintiff and Kansas wheat farmers that seed wheat could be or likely was contaminated with RRW. Monsanto purposely withheld this information because it knew the impact RRW that it controlled or owned would have on the wheat market/industry if the public was made aware of the contamination.

**D.     Discovery of RRW in Unsegregated Fields**

21.     Contamination of the American wheat supply with Monsanto's RRW was first discovered in or around April 2013 by an Oregon farmer who noticed some volunteer wheat plants that had survived Monsanto's Roundup herbicide he sprayed in preparation for planting.

22.     Alarmed, the Oregon wheat farmer sent samples to a scientist at OSU, who received the samples on April 30, 2013.  OSU scientists tested the samples, and, based on preliminary tests, the samples tested positive for a glyphosate-resistant trait.

23.     The OSU scientist contacted APHIS on May 3, 2013.  APHIS immediately began a formal investigation into the situation that included, among other things, dispatching investigators onsite to investigate how this situation occurred and collect additional samples from the Oregon farm.  On May 29, 2013, APHIS made the public announcement about this detection as soon as USDA laboratories had absolute confirmation that the volunteer wheat was RWW:

> The U.S. Department of Agriculture's (USDA) Animal and Plant Health Inspection Service (APHIS) announced today that test results of plant samples from an Oregon farm indicate the presence of genetically engineered (GE) glyphosate-resistant wheat plants.  Further testing by USDA laboratories indicate the presence of the same GE glyphosate-resistant wheat variety that Monsanto was authorized to field test in 16 states from 1998 to 2005.  APHIS launched a formal investigation after being notified by an Oregon State University scientist that initial tests of wheat samples from an Oregon farm indicated the possible presence of GE glyphosate-resistant wheat plants.  There are no GE wheat varieties approved for sale or in commercial production in the United States or elsewhere at this time.

News Release, USDA Animal & Plant Inspection Service, USDA Investigating Detection Of Genetically Engineered (GE) Glyphosate-Resistant Wheat In Oregon, (May 29, 2013), *available at* http://www.aphis.usda.gov/newsroom/2013/05/ge_wheat_detection.shtml (last visited June 6, 2013).

**E.     The Market Impact from Discovery of RRW Contamination**

24.     Monsanto knew that if RRW infiltrated and contaminated the American wheat and wheat seed supplies, identification, determination, and segregation of the entire American wheat supply would be required in order to prevent wheat seeds and crops containing those traits from entering the domestic and international food supply channels.  Monsanto also knew that such a situation would involve material disruptions in the American wheat trade and impose significant added costs to all participants in the American wheat market – costs and loss of business that will ultimately be borne, or have been borne, by American wheat farmers and

others in the American wheat supply chain, and that these events would detrimentally impact market prices for American wheat, causing severe financial damage to those that work in the American wheat supply chain, including American wheat farmers such as Plaintiff and the other members of the proposed class (defined below as "Class").

25.     Due to the commodity-based structure of the American wheat production and marketing chain, and the fungible and interchangeable nature of specific types of wheat within that producing and marketing chain, physical contamination or damage to any part of the chain amounts to physical contamination or damage to the entire chain – and all of the wheat therein. Monsanto's conduct thus directly led to and proximately caused the infiltration and physical contamination of the American wheat supply and wheat seed supply with RRW.

26.     Upon the news of the contamination becoming public, Japan immediately halted import of certain wheat blends.  South Korean millers also suspended purchases, while Taiwan demanded that the United States label wheat imports by state of origin.  The European Union announced that it will recommend member states to test imported American wheat, and requested that Monsanto provide a method to detect RRW in the imported wheat.

27.     In addition, domestic demand for wheat products, especially those from Kansas, likely has and will decrease because of the alarm over an unapproved genetically-modified wheat strain loose in the American wheat supply.

28.     As a result of the drop in demand both internationally and domestically, the economic value of American wheat, has declined and will continue to decline dramatically until the American grain supply is determined to be free of RRW.

29.     Monsanto's conduct thus directly and proximately caused harm to the entire American grain supply and grain seed supply, including Plaintiff's and other Class members' wheat and wheat seeds.

30.     Moreover, Monsanto's contamination of the American wheat and wheat seed supplies may have caused physical harm to the real and personal property, including the land, crops, machinery, transportation equipment, and storage bins, of those wheat farmers that have been exposed to the RRW that Monsanto allowed loose into the public.

## V.     CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure ("Rules" or, individually, "Rule"), on behalf of himself and the Class, which is defined as follows:

All persons and entities who grew, owned, cultivated, harvested and/or had planted wheat from May 29, 2013 to present.

Excluded from the Class are the Court and its officers, employees, and relatives; Monsanto and its subsidiaries, officers, directors, employees, contractors, and agents; and government agencies.

32.     The requirements of Rule 23(a) are satisfied for the Class because the members of the Class are so numerous and geographically dispersed that joinder of all its members is impracticable.   There are hundreds, if not thousands, of members of the Class.   Thus, the "numerosity" requirement of Rule 23(a)(1) is satisfied.

33.     The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to each of the respective Plaintiff and the other members of the Class he seeks to represent.   Among those common questions of law or fact are:

a.     whether Monsanto, through its acts or omissions, caused RRW to contaminate the U.S. wheat and U.S. wheat seed supplies;

b. whether Monsanto is legally responsible for contaminating the U.S. wheat and U.S. wheat seed supplies under one or more of the legal theories asserted in this Complaint;

c. whether the members of the Class have sustained or continue to sustain damages as a result of Monsanto's wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages for the Class;

d. whether the members of the Class are entitled to compensatory, exemplary, or punitive damages; and

e. whether the members of the Class are entitled to declaratory, injunctive, or other equitable relief.

34. Plaintiff's claims are typical of the claims of all other members of the Class it seeks to represent because they arise from the same course of conduct by Monsanto and are based on the same legal theories – as do the claims of all other members of the Class. Moreover, Plaintiff seeks the same forms of relief for itself as it does on behalf of the absent Class members. Accordingly, Plaintiff satisfies the "typicality" requirement of Rule 23(a)(3).

35. Because its claims are typical of the Class he seeks to represent, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff has no conflicts with, or interests antagonistic to, the wheat producers comprising the other members of the Class it seeks to represent relating to the claims set forth herein. Also, Plaintiff's commitment to the vigorous prosecution of this action is reflected in its retention of competent counsel experienced in litigation of this nature to represent it and the other members of the Class. Accordingly, Plaintiff satisfies the adequacy of representation requirement of Rule 23(a)(4).

36. This action also meets the requirements of Rule 23(b)(1). Absent a representative class action, members of the proposed Class would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be brought by individual wheat producers, the resulting multiplicity of lawsuits would cause undue hardship and expense

for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated wheat producers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

37.     This action also meets the requirements of Rule 23(b)(2), in that Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making final injunctive or corresponding declaratory relief with respect to each respective Class appropriate.

38.     This action additionally meets the requirements of Rule 23(b)(3).   Common questions of law or fact, including those enumerated above, exists to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior, if not the only method for the fair and efficient adjudication of this controversy.   Class treatment will permit large numbers of similarly-situated persons to prosecute their respective claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.   Furthermore, while damages to members of the proposed Class are substantial in the aggregate, the damages to any individual member of the proposed Class may be insufficient to justify individually controlling the prosecution of separate actions against Defendant.

39.     This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to members of the Class by first-class mail and through alternative means of publication and the Internet.

## **COUNT I: GROSS NEGLIGENCE**

40.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

41.     With respect to its testing, growing, storage, transportation, disposal or dissemination of RRW, Monsanto had a duty to use its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by an expert in Monsanto's business.

42.     Monsanto knew or should have known the high degree of risk of harm to the American wheat supply when conducting its RRW field tests.  Monsanto knew or should have known the drastic consequences on the American wheat supply should its experimental RRW spread from the test fields unto commercial wheat farms.  Monsanto knew or should have known that the release of RRW into the public would lead to a significant decline in value of the wheat crop in the United States, and raise costs for American wheat producers and the wheat supply chain to store and test for contamination, as well as further injury to the reputation of the American wheat supply from contamination, and as set forth in the preceding paragraphs. Accordingly, Monsanto knew or should have known that the utmost importance in taking the proper precautions to prevent contamination and spread when testing, growing, storing, transporting, disposing, of, or otherwise disseminating RRW.

43.     Nevertheless, Monsanto showed a reckless disregard for the safety of others, including Plaintiff and members of the Class because despite this knowledge, Monsanto failed to take adequate, reasonable and necessary precautions to prevent the contamination of the American wheat supply with RRW.

44.     Monsanto's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiff and other Class members.

45.     Monsanto's conduct showed a complete indifference to or conscious disregard of the rights of others, including Plaintiff and members of the Class, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

## COUNT II: COMMON LAW NEGLIGENCE *PER SE*

### FAILURE TO COMPLY WITH STANDARDS OF CARE IMPOSED BY THE PLANT PROTECTION ACT AND 7 C.F.R. PART 340

46.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

47.     Between 1997 and 2005, Monsanto handled, developed, tested and stored RRW. During the time period relevant to this action, RRW was and continues to be a "regulated article," as defined by 7 C.F.R. § 340.1:

> Any organism which has been altered or produced through genetic engineering, if the donor organism, recipient organism, or vector or vector agent belongs to any genera or taxa designated in Sec. 340.2 and meets the definition of plant pest, or is an unclassified organism and/or an organism whose classification is unknown, or any product which contains such an organism, or any other organism or product altered or produced through genetic engineering which the Administrator, determines is a plant pest or has reason to believe is a plant pest.  Excluded are recipient microorganisms which are not plant pests and which have resulted from the addition of genetic material from a donor organism where the material is well characterized and contains only non-coding regulatory regions.

48.     Under 7 C.F.R. § 340.0(a)(l) and (2), no person shall "introduce" a "regulated article" except by permit or pursuant to notification  and  such introduction "is in conformity

with all other applicable restrictions in this part." See also 7 U.S.C. § 7711(a), (c); 7 U.S.C. § 7712 (a), (c).

49.    "Introduce" is defined in 7 C.F.R. § 340.1 as meaning "[t]o move in or through the United States, to release into the environment, to move interstate, or any attempt there at." "Move" is defined as "[t]o ship, offer for shipment, offer for entry, import, receive for transportation, carry, or otherwise transport or move, or allow to be moved into, through or within the United States. *Id*.  "Release into the environment" is defined as "[t]he use of regulated article outside the constraints of physical confinement that are found in a laboratory, contained greenhouse, or a fermenter or other contained structure." *Id*.

50.    The "applicable restrictions" for "regulated articles" "introduced" in the United States include the following:

(1)    If the plant or plant materials are shipped, they must be shipped in such a way that the viable plant material is unlikely to be disseminated while in transit and must be maintained at the destination facility in such a way that there is no release into the environment.

(2)    When the introduction is an environmental release, the regulated article must be planted in such a way that they are not inadvertently mixed with non-regulated plant materials of any species which are not part of the environmental release.

(3)    The plants and plant parts must be maintained in such a way that the identity of all material is known while it is in use, and the plant parts must be contained or devitalized when no longer in use.

(4)    There must be no viable vector agent associated with the regulated article.

(5)    The field trial must be conducted such that:

i.    The regulated article will not persist in the environment, and
ii.    No offspring can be produced that could persist in the environment.

(6)    Upon termination of the field test:

      i.      No viable material shall remain which is likely to volunteer in subsequent seasons, or

      ii.     Volunteers shall be managed to prevent persistence in the environment.

7 C.F.R. § 340.3(c).

51.     Monsanto had a duty to comply with the standards of care established by the Plant Protection Act and 7 C.F.R. Part 340, *et seq.* The injuries and damages sustained by Plaintiff as described above, are the type that the Plant Protection Act and 7 C.F.R. Part 340, *et seq.* were designed to prevent, and Plaintiff is among the class of persons that the Act and the regulations were intended to protect.

52.     Monsanto did not comply with the standards of care set by the Plant Protection Act and 7 C.F.R. Part 340, by shipping, planting, maintaining, testing, growing, disposing of, or otherwise disseminating RRW in violation of these regulatory standards, including but not limited to, introducing RRW without permit or notification and/or also:

(1)     Not shipping RRW "in such a way that the viable plant is unlikely to be disseminated while in transit";

(2)     Not maintaining RRW "at the destination city in such a way that there is no release into the environment";

(3)     Not planting RRW "in such a way that they [were] not inadvertently mixed with non-regulated plant materials";

(4)     Not maintaining RRW "in such a way that the identity of all material [was] known while in use, and that [the RRW was not] contained or devitalized when no longer in use";

(5)     Not conducting its field tests of RRW "such that (i) [RRW] will not persist in the environment, and (ii) [n]o offspring can be produced that could persist in the environment"; and

(6)     Not terminating the field tests of RRW such that "(i) [n]o viable material shall remain with is likely to volunteer in subsequent seasons, or (ii) [v]olunteers shall be managed to prevent persistence in the environment."

53.     Monsanto breached its duties, as alleged above, breached the requisite standard of care, and was thereby negligent.

54.     As a direct and proximate result of Monsanto's breaches, Plaintiff has sustained substantial injuries and damages, including those alleged above. Monsanto's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, of which Monsanto was aware, but Monsanto nevertheless proceeded to engage in the conduct with conscious indifference to the rights, safety, or welfare of others - including Plaintiff, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

55.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

56.     With respect to its testing, growing, storage, transportation, disposal or otherwise dissemination of RRW, Monsanto had a duty to use its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by an expert in Monsanto's business.

57.     As alleged above, Monsanto breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, transporting, disposing of, or otherwise disseminating RRW to prevent it from contaminating the American wheat and wheat seed supplies.

58.     Monsanto breached its duties (as alleged above) and the requisite standard of care, and was thereby negligent.  Monsanto's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiff and other Class members.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

## COUNT IV: COMMON LAW STRICT LIABILITY IN TORT – ULTRAHAZARDOUS ACTIVITY

59.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

60.     Monsanto's testing, growing, storage, transportation, disposal, or otherwise dissemination of RRW constituted and continues to constitute an abnormally dangerous activity or ultrahazardous activity, because, as illustrated above, such activities create a high degree of risk of harm and the harm has been and will be significant, and the risk cannot be eliminated by the exercise of reasonable care, the activity is not a matter of common usage, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiff and other members of the Class.  In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

61.     The type of harm suffered by Plaintiff and other members of the Class is the kind of harm the possibility of which makes the activity abnormally dangerous.

62.     As a direct and proximate result of Monsanto's ultrahazardous or abnormally dangerous activities, Plaintiff and other members of the Class have sustained substantial injuries and damages, including those alleged above.

63.     Monsanto is thus strictly liable to Plaintiff and other members of the Class for all injuries and damages that have resulted or will result from its abnormally dangerous activities with respect to RRW.

64.     Monsanto knew of the danger and its conduct showed complete indifference to or conscious disregard of the rights of others – including Plaintiff and the other members of the Class – thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

## COUNT V:  PUBLIC NUISANCE

65.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

66.     Through its conduct alleged above, Monsanto has created a public nuisance by causing widespread contamination of the U.S. wheat supply and wheat seed supplies with its RRW.  This constitutes an unreasonable and substantial interference with rights common to the general public.

67.     This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities.  It arises from Monsanto's testing, growing,

storage, transportation, disposal, or otherwise dissemination of RRW (a) without adequate precautions to prevent contamination of the U.S. wheat supply; (b) with the knowledge that there was a substantial risk that it would contaminate the U.S. wheat supply; or (c) with the knowledge that there was a substantial risk it would contaminate U.S. and foreign food supplies.

68.     Monsanto has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storage, transportation, disposal, or otherwise dissemination of RRW.  Monsanto has further unreasonably interfered with the public's right to expect that wheat sold to the general public is free from contamination with RRW as well as the public right to be notified of whether the wheat sold to the public is contaminated with genetically-modified organisms - including those found in RRW so that the public has the freedom to choose to purchase and consume non-contaminated wheat.

69.     This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by federal and state law, is of a continuing nature, and has produced a permanent or long-lasting effect.

70.     Plaintiff and the members of the Class have suffered harm caused by Monsanto's public nuisance distinct from and different than that suffered by the general public in that, as described above, he has suffered business losses.

71.     In light of the surrounding circumstances, Monsanto knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiff and members of the Class.  Monsanto nonetheless continued such conduct in reckless disregard of or conscious indifference to those consequences, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

## COUNT VI: PRIVATE NUISANCE

72.     Plaintiff incorporates by reference the foregoing paragraphs.

73.     By its conduct alleged above concerning testing, growing, storage, transportation, disposal, or otherwise dissemination of RRW, Monsanto also created a private nuisance.

74.     Plaintiff and other members of the Class have property rights and are privileged in respect to the use and enjoyment of the land on which they produce wheat.

75.     Monsanto's contamination of the U.S. wheat supply has unreasonably interfered with, and will unreasonably interfere with and will substantially impair, Plaintiffs use and enjoyment of his interests in the land on which he grows or may grow wheat.

76.     Monsanto's conduct was committed with conscious or reckless disregard of the rights of Plaintiff and other members of the Class and was grossly negligent and unreasonable. The gravity of the harm far outweighs the utility of Monsanto's conduct.

77.     As a direct and proximate result of Monsanto's conduct, Plaintiff and members of the Class have sustained substantial injuries and damages, including those alleged above.

78.     In light of the surrounding circumstances, Monsanto knew or should have known that its conduct would naturally or probably result in injuries and damages to Plaintiff and members of the Class.  Monsanto nonetheless continued such conduct in reckless disregard of or conscious indifference to those consequences, thereby justifying an award for punitive damages.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.      For an order certifying this action as a class action, appointing Plaintiff as the representative of the Class and appointing his attorneys as Class Counsel;

2.      For compensatory damages on all applicable claims, in an amount to be proven at trial;

3.      For appropriate injunctive relief restraining Monsanto from engaging in further conduct that is substantially likely to lead to additional contamination of the U.S. wheat and wheat seed supplies and directing Monsanto to take affirmative steps to achieve complete decontamination of Class members' farmland, farming, harvesting, and transportation equipment, as well as their on-farm storage facilities, to prevent contamination for the future growing seasons, and to monitor future growing seasons to ensure no further contamination has occurred;

4.      For punitive damages;

5.      For an award of attorneys' fees, costs and expenses; and

6.      For prejudgment interest;

7.     For such other and further relief that the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

## DETERMINATION OF PLACE OF TRIAL

Plaintiff requests that the trial of this matter be held in the United States District Court for the District of Kansas, Kansas City Division.


Date: June 25, 2013                    Respectfully Submitted,

                                       EDGAR LAW FIRM LLC


                                       By   /s/ John F. Edgar
                                       John F. Edgar          KS# 18080
                                       Christopher A. Pedroley   KS# 25872
                                       1032 Pennsylvania Ave.
                                       Kansas City, MO 64105
                                       Telephone:   (816) 531-0033
                                       Facsimile:    (816) 531-3322
                                       Email: jfe@edgarlawfirm.com
                                       Email: cap@edgarlawfirm.com

                                       SHEPHERD FINKELMAN MILLER
                                          & SHAH LLP
                                       Scott R. Shepherd
                                       35 East State Street
                                       Media, PA 19063
                                       Telephone:   (610) 891-9880
                                       Facsimile:    (610) 891-9883
                                       Email: sshepherd@sfmslaw.com

                                       AHDOOT & WOLFSON, PC
                                       Tina Wolfson
                                       10850 Wilshire Blvd. Ste. 370
                                       Los Angeles, CA 90024
                                       Telephone:    (310) 474-9111
                                       Facsimile:    (310) 474-8585

Email: twolfson@ahdootwolfson.com

ATTORNEYS FOR PLAINTIFFS